IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TROY L. KENDALL,

                    Plaintiff,

          vs.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security;

                    Defendant.

**8:20CV517**

**MEMORANDUM AND ORDER**

This is an action for judicial review for a final decision of the Commissioner of the Social Security Administration ("the Commissioner"). Filing No. 1. The claimant, Troy L. Kendall, appeals the Commissioner's decision to deny his application for Social Security Disability ("Disability") and Social Security Income ("SSI") benefits under Title II and XVI of the Social Security Act and seeks review pursuant 42 U.S.C. § 405(g), and 1383(c)(3). *See* Filing No. 15 (Plaintiff's Motion for an Order Reversing the Commissioner's Decision) and Filing No. 17 (Defendant's Motion for an Order Affirming the Commissioners Decision). A transcript of the hearing held on February 18, 2020, is found in the record at Filing No. 13-2 at 26. This Court has jurisdiction under 5 U.S.C. §§ 702 and 706 to review the final decision.

**BACKGROUND**

**I.     Procedural History**

Kendall filed an application for disability and SSI on August 22, 2018 alleging disability beginning January 12, 2016, which was later amended to the date of his 50th birthday, November 17, 2017. Filing No. 16 at 3. Mr. Kendall alleged disability due to

1

disorders of back-discogenic and degenerative (DDD), nerve damage, bulging discs, spinal stenosis, migraines, liver damage, angular tear, 2 feet of intestines removed, and acid reflux.  Filing No. 16 at 10.  Mr. Kendall's application was denied by the Commissioner, and he was later granted a hearing on February 18, 2020 where Mr. Kendall testified to his disabling limitations.  The Administrative Law Judge denied Mr. Kendall benefits on March 6, 2020, finding he was not disabled, and the Appeals Council denied review on October 21, 2020.  Filing No. 1.  Mr. Kendall seeks review of the final decision of the Commissioner, denying him disability benefits.

## II.    Testimony from ALJ Hearing

Mr. Kendall was born on November 17, 1967, and received his high school diploma from Millard South High School in Omaha, NE.  Filing No. 13-2 at 35.  Mr. Kendall had previously been involved in a train collision at his job, which led to his back pain and limitations.  Filing No. 16 at 5.  Mr. Kendall previously worked for Great Western Railway (CGBR), then later in Volvo heavy machinery for Scott Van Keppel, then as a mechanical supervisor for Amtrak train.  Filing No. 13-2 at 37–38.  At one point Mr. Kendall was working two of these jobs at the same time.  *Id.* at 39.  Mr. Kendall's final job before staying permanently unemployed was in 2016 for Shopco, a grocery store where he was a part time shelf stocker but was fired because he could not work due to an injury.  *Id.* at 41.  Mr. Kendall did not look for employment after Shopco because of the physical and mental challenges he had while working there, such as, pain from continuously bending and standing up, heavy lifting, constant walking, and constant bathroom breaks due to medications.  *Id.*  Mr. Kendall testified that the work he performed at Shopco started to "kill" him because of the constant movement and lifting which essentially left him

immobile. *Id.* at 41. Mr. Kendall has not worked or done anything for income since leaving Shopco. *Id.* at 42.

Mr. Kendall testified that he does not do house or yard work, besides taking his long-time girlfriend to appointments and cooking, and can only sit/stand comfortably for approximately 20 minutes increments. *Id.* at 42–43. Mr. Kendall testified that he is more comfortable when he is laying down and lays down for approximately 20/21 hours in a single day. *Id.* at 43. Mr. Kendall also suffers from daily headaches and migraines and suffers about 25 a month with migraines staying around for approximately 1-2 days. *Id.*

Mr. Kendall began seeing his primary care physician, Dr. Titus, in 2017 who referred him to various back surgeons to see if surgery was an option. *Id.* at 43–44. Mr. Kendall saw three different neurosurgeons, including Dr. Long, who informed Mr. Kendall of his nerve damage and indicated that he was not a candidate for surgery. *Id.* at 45. Mr. Kendall has also previously had 2 feet of his intestines removed due to a perforated intestine, has degenerative disc disease, and rotary cuff surgery on his left shoulder which he still causes him pain, limiting what he can lift. *Id.* At the time of the hearing, Mr. Kendall was on three different medications: Tramadol, a pain medication; cyclobenzaprine, a muscle relaxer; and sumatriptan, for headaches. *Id.* at 48.

### III.   Medical Evidence

Mr. Kendall saw Dr. Kevin Balter, M.D., on August 22, 2017, approximately three months before his onset date, and stated that he thought the Oxycontin he was prescribed was helping to keep his pain tolerable. Filing No. 13-9 at 482. Mr. Kendall stated that he did go to Horizon Spine for physical therapy, but did not find it helpful, and he had not

scheduled his back injections yet because he was not sure if that is the course he wanted to take. *Id.* at 482.

Dr. Stephen Titus, M.D., became Mr. Kendall's primary care physician on September 19, 2017, in order to help treat his back pain and other current injuries. Filing No. 13-7 at 336. Dr. Titus then referred Mr. Kendall to Nebraska Spine to have his back evaluated and then to an orthopedist to have his trigger finger evaluated. *Id.* at 336. Mr. Kendall was seen by Dr. Titus again on November 14 and December 12, 2017, at which time Mr. Kendall's back pain was unchanged, and Dr. Titus prescribed Mr. Kendall Gabapentin, a nerve pain medication. *Id.* at 337.

Mr. Kendall was referred by Dr. Titus to be evaluated by Dr. Timothy A. Burd, M.D., on January 2, 2018, with chief complaints of lower back pain that occasionally radiated down his legs and up into his neck. *Id.* at 298. Mr. Kendall stated that his pain was constant, worse when standing or lifting, with current level of pain a 5 (on a 0-10 scale), and the worst level of pain in the last 7 days being a 9 (on a 0-10 scale). *Id.* at 298. After examination, Dr. Burd's findings revealed lumbar disc degeneration L4-L5, lumbosacral disc degeneration, bulging disc (L4-L5) right, and bulging disc (L5-S1) central. *Id.* at 302. Dr. Burd determined that Mr. Kendall was not a candidate for spine surgery. *Id.*

Mr. Kendall was seen by Dr. Titus on January 16, 23, and February 13, 2018, where Kendall continued to take Oxycodone for pain management and was put back on Gabapentin, referred to another specialist, and had sleep apnea studies performed. *Id.* at 338. Mr. Kendall was again evaluated by Dr. Titus on March 13, 2018 where Kendall discussed the frequently severe back pain that radiate down into his buttocks. *Id.* In that visit, Dr. Titus explained Dr. Long's findings and how surgery was not an option at that

time. *Id.* Dr. Titus referred Mr. Kendall for physical therapy and checked his liver function to determine if he can safely take NSAIDs (pain reliver) instead of oxycodone to minimize the nausea associated with oxycodone. *Id.*

Mr. Kendall was examined by Dr. Titus again on April 17, 2018, his back pain was reportedly unchanged, oxycodone was refilled, and Kendall complained of recurrent epigastric discomfort and nausea. *Id.* at 339. Mr. Kendall had not scheduled his physical therapy, but planned to do so, and had not had liver testing, but Dr. Titus had one performed this visit. *Id.* Mr. Kendall was examined by Dr. Titus on June 26, 2018 after slipping at a grocery store on June 23, 2018 which resulted in increased lower backpain, moderately restricted range of motion, and tenderness in the lumbosacral and iliac crest regions. *Id.* at 340. Dr. Titus placed Kendall on cyclobenzaprine, a muscle relaxant. *Id.*

Mr. Kendall was examined again on July 10, 2018, and reported his back pain was worse than ever, the muscle relaxant was not helping him, and he was in constant pain. *Id.* Dr. Titus reported a finding of tenderness in the lumbosacral region, a limited range of motion, and believed Mr. Kendall "could certainly be a candidate for consideration for a spinal cord simulator for pain control." *Id.* Mr. Kendall was evaluated by Dr. Stephen M. Greene MD., on July 12, 2018, for evaluation of his back pain. *Id.* at 521. Dr. Green noted mild diffuse lumbar tenderness to palpation, moderately reduced range of motion due to pain, and straight leg raising producing lower back pain and pain in the respective thigh. *Id.* Dr. Green did not recommend surgery and stated Mr. Kendall may benefit from physical therapy or a referral to a pain management specialist for treatment of his chronic low back pain and his acute exacerbation. *Id.* at 523.

### IV.     Consultative Examinations

Mr. Kendall was examined by Dr. James Wax, M.D., on December 27, 2018, for a consultative examination regarding his disability. Filing No. 13-7 at 355. Upon initial examination, Dr. Wax noted that Mr. Kendall's general appearance showed back pain, slight limp, he angled a bit to the right when he walks, he had tenderness to palpation, and can only flex partly because of back pain. Id. at 356–57. When examining range of motion, Dr. Wax found that Mr. Kendall could flex his lumbar spine at about 45 degrees and extend to about 20 degrees, when Mr. Kendall moved his back, it pulled and created pain. Id. at 358. Dr. Wax reviewed Nebraska Spine and Pain Center's medical reports and found there were definite limitations to lower back, lumbosacral spine to the distal femur, and their impression was lumbosacral disc degeneration at L4-L5, bulging disc at L4 and L5. Id. Dr. Wax's final impression was that Mr. Kendall has chronic pain from his previous injury, has difficulty flexing forward and moving his back, has difficulty lifting more than 5 pounds, and it is recommended that he continue his medications. Id. However, Dr. Wax left the final decision regarding the patient's statutory disability to the Nebraska Disability Determination Center. Id.

On January 4, 2019, Dr. Nancy Ingham, M.D., a state agency medical consultant, reviewed Mr. Kendall's medical records and determined that Mr. Kendall could perform light work; could occasionally lift up to 20 pounds; frequently lift 10 pounds; push and pull without limitations; and could sit, stand, or walk for up to 6-hours in an 8-hour workday. Filing No. 13-3 at 64–65. Dr. Ingham also determined that Mr. Kendall could never climb ladders, ropes, or scaffolds; but could perform occasional postural movements, therefore, not disabled. Id. at 65. On February 15, 2019, Dr. Jerry Reed, M.D., a state agent medical

6

consultant, also reviewed Mr. Kendall's medical records and came to the same conclusion as Dr. Ingham, therefore, not disabled.  *Id.* at 91–92.

On January 30, 2020, Dr. Titus, Mr. Kendall's primary medical provider, gave his professional opinion concerning Mr. Kendall's limitations.  Filing No. 13-9 at 537.  Dr. Titus recounted Mr. Kendall's past medical history and the fact that he is a nonsurgical candidate with intractable lower back pain.  *Id.*  Dr. Titus stated that Mr. Kendall's lower back pain interferes with his daily activities, limits his ability to walk or stand no more than 2 hours in an 8-hour workday, and lifting 10 pounds max.  *Id.*  Dr. Titus stated that Mr. Kendall needs to rest or recline at least an hour on a scheduled basis throughout the day due to the ongoing pain that is exacerbated by minor daily activities.  *Id.*

### V.    The ALJ's Findings

The ALJ found that Mr. Kendall was not disabled within the meaning of the Social Security Act from November 17, 2017, through the date of this decision.  Filing No. 13-2 at 11.  The ALJ used the five-step sequential evaluation process in determining whether an individual is disabled.  Filing No. 13-2 at 11.  The ALJ found that Mr. Kendall had not engaged in substantial gainful activity since November 17, 2017, the amended alleged onset date, and had not worked since 2016.  *Id.* at 12.  The ALJ agreed with the findings that Mr. Kendall had the following severe impairments: degenerative disc disease of the lumbar spine and osteoarthritis of the left should.  *Id.*  The ALJ acknowledged that Mr. Kendall's impairments were severe and imposed more than minimal limitations on his ability to perform basic work-related activities.  *Id.* at 13.

The ALJ also acknowledged Mr. Kendall's diagnoses of bilateral carpal tunnel syndrome, right middle trigger finger, and migraine headaches, but found that they are

7

only minor limitations of Mr. Kendall's ability to work. *Id.* at 13. The ALJ came to this finding based on nerve conduction studies that were performed showing mild symptoms, Mr. Kendall reported improved symptoms, Mr. Kendall stated medication was helping his migraines, and many times when Mr. Kendall did not mention his migraines at appointments. *Id.* at 13. The ALJ acknowledged Mr. Kendall's impairments of hepatic steatosis and gastroesophageal reflux disease (GERD) and his history of a bowl resection, but found they were not severe. *Id.* at 13. The ALJ came to this finding based on liver function tests showing normal levels, and failure to show evidence of how the hepatic steatosis and GERD affected his ability to work. *Id.* at 13. The ALJ also reasoned that Mr. Kendall failed to show evidence of how his past bowel resection limited his ability to work. *Id.* at 13.

The ALJ concluded that Mr. Kendall did not have an impairment, or combination of impairments, that met, or medically equaled, the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Filing No. 13-2 at 14. At the oral hearing, Mr. Kendall's attorney conceded that his severe impairments did not meet, or medically equal, a listing, but the ALJ reviewed the criteria of the listed impairments as set forth in Subpart P, Appendix 1, Section 1.02 and 1.04. *Id.* The ALJ found Mr. Kendall's left shoulder impairment did not meet the requirements under 1.02 because the impairment involved only one joint in the left arm, and not both. *Id.* The ALJ found Mr. Kendall's back impairment did not meet the requirements under 1.04 because there is no nerve root compression, spinal arachnoiditis, or pseudoclaudication. *Id.*

8

The ALJ concluded that Mr. Kendall had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except he can only occasionally climb, balance, stoop, kneel, crouch, crawl, and reach overhead. *Id.* The ALJ reached this decision through a two-step process: (1) whether there was an underlying medically determinable physical, or mental, impairment that could reasonably be expected to produce the claimant's pain or other symptoms, and (2) by evaluating the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. *Id.* at 14–15.

The ALJ found that Mr. Kendall's back and shoulder impairments could reasonably be expected to produce pain and the alleged symptoms. *Id.* at 15. However, the ALJ stated that Mr. Kendall's alleged intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. *Id.* The ALJ reasoned that Mr. Kendall was referred out to three separate specialists (two spinal and one orthopedic) by his primary doctor for consideration of his back. *Id.* Each recommended conservative courses of treatment, such as medication management, physical therapy, and injection therapy. *Id.* The ALJ found that the treatment prescribed to Mr. Kendall since November 2017 had always been conservative in nature, with the primary treatment being pain medications and muscle relaxants. *Id.* Mr. Kendall was also referred to physical therapy, TENS unit, radiofrequency ablation, and spinal injections, but did not find them helpful, or in some cases, declined treatment for various reasons, not including financial constraints. *Id.* at 15.

The ALJ found that Mr. Kendall's alleged extreme limitations from his back pain were not corroborated with clinical findings and observations in treatment notes. *Id.* at

16.  Additionally, Mr. Kendall alleged he could not sit for longer than 15 minutes and spent approximately 20-21 hours a day laying down, however, the treatment notes since November 2017 show no mention of medical observation of discomfort during appointments.  *Id.*  The ALJ reasoned Mr. Kendall only exhibited pain behaviors during a few medical appointments, and there was no evidence of muscle atrophy, or wasting, from the vast majority of time spent lying down.  *Id.*  The ALJ further noted, that due to the lack of record for the degree of limitation claim, this suggested that Mr. Kendall's statements and testimony exaggerated the limiting effects of his pain.  *Id.*

The ALJ did recognize the abnormalities observed in treatment but stated they are not consistent and did not significantly limit Mr. Kendall's strength.  *Id.*  The ALJ also stated that there was no evidence of sensory deficits in the lower extremities, which required a need for some limitations on heavy lifting and postural activities but did not warrant greater physical limitations.  *Id.*  The ALJ also noted that Mr. Kendall continued to allege shoulder pain after July 2017, but there were no complaints to treatment providers in the record.  *Id.* at 17.  The ALJ stated that there was no medical evidence that the tenderness in his back was severe or painful enough to affect upper extremity, strength, coordination, or fine motor skills, therefore, did not warrant lifting limitations.  *Id.*  Additionally, neither specialist that examined Mr. Kendall suggested any restrictions or limitations.  *Id.*  The ALJ acknowledged Dr. Titus's recommendation for restricting standing and walking to 2 hours in an 8-hour day, lifting no more than 10 pounds, and resting or reclining at least 1 hour per day on a scheduled basis, but noted Dr. Titus's failure to cite any clinical findings or observations.  *Id.*  The ALJ agreed that Mr. Kendall should not be lifting more than 20 pounds, performing more than occasional postural

10

activities, and limiting overhead reaching. *Id.* at 18. However, in looking at the evidence as a whole, the ALJ found there was no indication that Mr. Kendall would be unable to perform work within these parameters. *Id.*

The ALJ found Mr. Kendall was not capable of performing past composite jobs which consisted of a pullman car repairer for the railroad, a railroad car repairer, and machinery manager. *Id.* at 19. The ALJ acknowledged that Mr. Kendall was 50 years old and approaching advanced age on the amended alleged disability onset date (20 C.F.R. § 404.1563 and 416.963). *Id.* However, the transferability of job skills is not material to the determination of disability because Mr. Kendall is not found to be disabled. *Id.*

The vocational expert gave three recommendations of light, unskilled work that Mr. Kendall could perform given his specified limitations: (1) Cashier II; (2) cafeteria attendant; and (3) small product assembler I. *Id.* at 20. The ALJ agreed that the recommendations were consistent with the information contained in the Dictionary of Occupational Titles, except as it related to reaching. *Id.*

## STANDARD OF REVIEW

When reviewing a Social Security Disability benefits decision, the district court does not act as a factfinder or substitute its judgment for the judgment of the ALJ or the Commissioner. *See Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995) (citing *Loving v. Dep't of Health & Hum. Servs., Sec'y*, 16 F.3d 967, 969 (8th Cir. 1994)). The court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir.

2000). Substantial evidence equates to something less than a preponderance of the evidence, but more than a mere scintilla; such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

However, this "review is more than a search of the record for evidence supporting the [Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (quoting *Hunt v. Massanari*, 250 F.3d 622, 623 (8th Cir. 2001); *Cooper v. Sec'y of Health & Hum. Servs.*, 919 F.2d 1317, 1320 (8th Cir. 1990)). In determining whether there is substantial evidence to support the Commissioner's decision, the court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

## DISCUSSION

### 1. Sequential Analysis

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education, and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998).

At step two, the claimant has the burden to prove he or she has a severe medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013).

At step three, "[i]f the claimant suffers from an impairment that is listed in [20 C.F.R. § 404.1520(a)] the Listings or is equal to such a listed impairment, the claimant will be determined disabled without considering age, education, or work experience." *Flanery v. Chater*, 112 F.3d 346, 349 (8th Cir. 1997); *see also Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). "The Listings" stipulate the criteria for each impairment that is considered presumptively disabling. 20 C.F.R. Part 404, Subpart P, App. 1 § 11.03. If the claimant does not meet the listing requirements, the ALJ will instead determine the claimant's residual function capacity (RFC), which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's residual functional capacity ("RFC") is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545(a). The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical history, opinions of treating physicians and specialty physicians, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). "'The RFC must (1) give appropriate consideration to all of [the claimant's] impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting.'" *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) (quoting *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011)).

13

At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *See Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (citing *Reed v. Sullivan*, 988 F.2d 812, 815–16 (8th Cir. 1993)).

### 2. Treating Physician

"The ALJ must give 'controlling weight' to a treating physician's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh*, 786 F.3d at 1132 (quoting *Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir. 2007). Even if not entitled to controlling weight, a treating physician's opinion '"should not ordinarily be disregarded and is entitled to substantial weight.'" *Papesh*, 786 F.3d at 1132 (quoting *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007). The regulatory framework requires the ALJ to evaluate a testing source's opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. *See* 20 C.F.R. § 404.1527(c)(2). "When an ALJ discounts a treating physician's opinion, the ALJ should give 'good reasons' for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).

Recently, the Social Security Administration amended and reorganized the regulations and 20 C.F.R. §§ 404.1527 and 416.927 have been superseded by 20 C.F.R. §§ 404.1520c and 416.920c for claims filed after March 27, 2017.  *See Seay v. Berryhill*, No. 5:16-CV-05096-VLD, 2018 WL 1513683, at *39 (D.S.D. Mar. 27, 2018).  According to new Social Security Administration rules effective March 27, 2017, the ALJ need not grant any medical opinion controlling weight, regardless of whether the opinion comes from a treating, examining, or consulting physician.  20 C.F.R. § 404.1520c.  Instead, the ALJ must evaluate medical opinions according to 5 factors: (1) Supportability, (2) Consistency, (3) Relationship to the claimant, which includes (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization, and (5) other factors.  *Id.*  According to the rule, supportability and consistency are the most important factors and must be addressed by the ALJ in his or her decision.  *Id.*  Thus, while the new rules do not dictate the weight the ALJ is to ascribe to any given medical opinion, the ALJ is required to explain why she finds a medical opinion to be persuasive or not.  *Dornbach v. Saul*, No. 4:20-CV-36 RLW, 2021 WL 1123573, at *3 (E.D. Mo. Mar. 24, 2021).  Therefore, the old standard that "when an ALJ discounts a treating [source's] opinion, she should give good reasons for doing so," still applies.  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).[1]

The Court finds that the ALJ erred in affording only little weight to the opinion of Dr. Titus, Mr. Kendall's treating physician, because of the alleged inconsistencies with the

---

[1] This Court reserves judgment on how the new rules interact with long held case law precedent outlining the substantial weight due to the medical opinions of treating physicians, as the result would be the same in this case no matter which rules apply. See *Papesh*, 786 F.3d at 1133.

other evidence in the record.  Filing No. 13-2 at 17.  The ALJ acknowledged Dr. Titus's record of Mr. Kendall's history of low back injury and intractable low back pain.  Filing No. 13-2 at 17.  However, the ALJ stated that Dr. Titus's clinical findings and observations do not support his opinions of Mr. Kendall's disability.  Filing No. 13-2 at 17.  The Court finds that Dr. Titus's, treating physician, opinion and evidence overwhelmingly supports Mr. Kendall's claim of disability.

The ALJ mainly focused on Dr. Titus's physician notes following each visit and the fact that he did not perform musculoskeletal examination during each appointment.  Filing No. 13-2 at 17.  When Dr. Titus did perform musculoskeletal exams, he only noted the relatively benign abnormalities of lumbar tenderness and limited range of motion, and not observe pain behaviors, acute distress, gait abnormalities, or loss of strength.  Filing No. 13-2 at 17.  The Court finds Dr. Titus's notes show that Dr. Titus observed findings of substantial back pain in Mr. Kendall that prompted him to refer Mr. Kendall to three different neurosurgery evaluations.  Filing No. 16 at 24.  Dr. Titus shows consistent notes of Mr. Kendall's limited range of motion, as well as the fact that Mr. Kendall was continuously on pain medications and muscle relaxants while under Dr. Titus's care.  Filing No. 16 at 24.  There is ample evidence in the record to confirm the findings of Dr. Titus.

The ALJ stated "that neither the treatment notes of Dr. Titus nor those of other medical personnel can be reconciled with Dr. Titus' opinions."  Filing No. 13-2 at 17.  The ALJ did not give much weight to Dr. Wax's opinion, who presented similar findings to those of Dr. Titus and who was the consultative examiner for Mr. Kendall.  Filing No. 13-2 at 18.  Dr. Wax performed an exam on Mr. Kendall on December 27, 2018, and found

his general appearance to be well developed, but he presented with back pain, held his torso when he walks, has a slight limp, and angles a bit to the right when he walks. Filing No. 13-7 at 356. Dr. Wax found Mr. Kendall's lower back to be sore, tenderness to palpation, and could only flex partially due to pain. Filing No. 13-7 at 357. When examining range of motion, Dr. Wax found that Mr. Kendall could flex his lumbar spine at about 45 degrees and extend to about 20 degrees, when Mr. Kendall moved his back, it pulled and created pain. Filing No. 13-7 at 358. Dr. Wax reviewed Nebraska Spine and Pain Centers medical reports on Mr. Kendall and found that there were definite limitations to lower back, lumbosacral spine to the distal femur, and their impression was lumbosacral disc degeneration at L4-L5, bulging disc at L4 and L5. Filing No. 13-7 at 358. Dr. Wax's final impression was that Mr. Kendall had chronic pain from his previous injury, had difficulty flexing forward and moving his back, had difficulty lifting more than 5 pounds, and recommended that he continue his medications. Filing No. 13-7 at 358. However, Dr. Wax left the final decision regarding statutory disability to the Nebraska Disability Determination Center. Filing No. 13-7 at 358.

The ALJ stated that Dr. Wax's opinion of Mr. Kendall's limitations were unaccompanied by rationale for the limitations, did not correspond with any of his clinical findings or observations, and, therefore, unpersuasive. Filing No. 13-2 at 18. However, Dr. Wax's opinions seem to correspond very closely with those of Dr. Titus's, Dr. Burd's, and Dr. Greene's. Dr. Burd confirmed that Mr. Kendall has lumbar disc degeneration at L4-L5, lumbosacral disc degeneration, bulging disc at L4-L5 on the right, and bulging disc at L5-S1 in the center. Filing No. 13-7 at 303. Dr. Burd's final recommendation was to continue conservative care, consider a second opinion with the pain specialist, and

consider getting a spinal cord simulator, but noted that surgical intervention would not help him. Filing No. 13-7 at 303. Mr. Kendall was evaluated by Dr. Greene, and noted mild diffuse lumbar tenderness to palpation, moderately reduced range of motion due to pain, and straight leg raising producing lower back pain and pain in the respective thigh. Filing No. 13-9 at 521. Dr. Green did not recommend surgery but stated Mr. Kendall may benefit from physical therapy or a referral to a pain management specialist for treatment of his chronic low back pain and his acute exacerbation. Filing No. 13-9 at 523.

The Court believes that Dr. Titus's medical opinion is well documented regarding Mr. Kendall's limitations and is adequately supported by the medical findings from that of Dr. Wax, Dr. Burd, and Dr. Greene. Accordingly, the Court finds that the ALJ erred in not giving more weight to the opinions of Dr. Titus.

### 3. Credibility

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process: (1) first, the ALJ considers if there is an underlying impairment that could reasonably produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit" the claimant's ability to work. Soc. Sec. Rul. 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01 (Mar. 16, 2016). In the second step of the analysis, in recognition of the fact that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence[,]" an ALJ must "examine the entire case record, including the objective

18

medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." 81 FR at 14168.

To determine the intensity and persistence of an individual's symptoms, the ALJ evaluates objective medical evidence, but "will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* However, the ALJ must "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *Id.* at 14169. If an ALJ cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then he or she must carefully consider other evidence in the record – including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors[2] set forth in [the Social Security] regulations" – in

---

[2] Those factors include:

"1) Daily activities; 2) The location, duration, frequency, and intensity of pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) Any other factors concerning an individual's function limitations and restrictions due to pain or other symptoms."
81 FR at 14169-70.

reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. *Id.*

Social Security Ruling 16-3p also provides:

We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect that ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively . . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

*Id.* at 14170. "[The Eighth Circuit Court of Appeals] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) (citing *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998)). Subjective allegations of disabling pain can be discredited if the claimant has only occasionally followed medical treatment or taken prescribed medications. *Singh*, 222 F.3d at 453; *see Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (stating, "A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole.").

The ALJ correctly found that Mr. Kendall's medically determinable impairments could reasonably be expected to cause the alleged symptoms. Filing No. 13-2 at 15. The ALJ erred in finding that Mr. Kendall's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. Filing No. 13-2 at 15. The ALJ stated that conservative course of treatment, medication management, physical therapy, and

20

injection therapy where all recommended because more aggressive treatment was not deemed necessary given the mild nature of Mr. Kendall's impairment.  Filing No. 13-2 at 15.   However, multiple doctors found Mr. Kendall's pain to be credible as he was continuously on pain medications such as: oxycontin, oxycodone, tramadol, cyclobenzaprine, and Gabapentin.  Filing No. 13-9 at 15, Filing No. 13-7 at 336 and 337, and  Filing No. 13-2 at 48.   Four different physicians acknowledged Mr. Kendall's limitations due to severe back pain, and each recommended a similar course of treatment which included pain management control with continuous medications.

The ALJ also found Mr. Kendall's statement, that he lays down for approximately 20-21 hours a day, was inconsistent with the record because his body shows no signs of decay or wasting from the vast majority of time laying down.  Filing No. 13-2 at 16.  However, Mr. Kendall made a persuasive argument that he did not show signs of wasting because he had just recently begun to stay in bed for 20 to 21 hours a day because of insurance issues that forced him to switch his pain medication to Tramadol, which left Mr. Kendall with less pain control by the time of the hearing.  Filing No. 16 at 17.  Mr. Kendall also pointed to the fact that in October 2018, he reported to social security that he was not spending most of his time in bed, but by December 2018, he had been in significant, unmanaged pain that resulted in more time laying down.  Filing No. 16 at 17.  This makes it very believable that wasting would not be readily apparent in Mr. Kendall's muscles since he had not been bedridden for very long at the time of the consultative examinations and hearing.   The record consistently supports Mr. Kendall's credibility and the ALJ should not have discredited it.

### 4. Vocational Expert's Testimony

In the fourth step of the sequential analysis, the ALJ considers whether a claimant's impairments keep him from doing past relevant work. 20 C.F.R. § 404.1520(e). A claimant's RFC is the most that one can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). The claimant is not disabled if the claimant retains the RFC to perform: "1. The actual functional demands and job duties of a particular past relevant job; or 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996) (quoting Soc. Sec. Ruling 82-61). During this step, an ALJ may consider the vocational expert's testimony when determining the claimant's RFC. Wagner, 499 F.3d at 853–54. The ALJ often asks the vocational expert a hypothetical question to help determine whether a sufficient number of jobs exist in the national economy that can be performed by a person with a similar RFC to the claimant. Guilliams, 393 F.3d at 804.

At the ALJ Hearing, the Vocational Expert was asked to classify Mr. Kendall's past work. Filing No. 13-2 at 50. The Vocational Expert stated that all four of Mr. Kendall's previous jobs would be classified as composite jobs. Id. Mr. Kendall's previous jobs include pullman car repairer, yard coupler, railroad car inspector and repair manager, and machinery and equipment rental and leasing manager. Id. at 51-52. Each of Mr. Kendall's previous jobs require light to medium physical demand level. Id.

The ALJ then asked the Vocational Expert several hypothetical questions, the first being:

> Please consider an individual of this vocational profile who could occasionally lift 20 pounds, frequently lift or carry 10 pounds. Could stand, sit or walk for six hours in an eight-hour day. Could occasionally do postural activities climb, balance, stop, kneel, crouch, crawl. Should not work on ladder or ropes, scaffolds. I'm also going

to add on that on the left shoulder, should not be required to do more than occasional overhead reaching. And that's because of the surgery. I know the surgeon gave no restrictions but I'm giving him the benefit of the doubt on that one. With that functional capacity, could such an individual return to any of the past jobs?

*Id.* at 54. To which the Vocational Expert answered, no. *Id.* The ALJ then asked the Vocational Expert to identify any work that would be appropriate at light exertion. *Id.* The Vocational Expert identified three jobs that Mr. Kendall could do with his limitations, including Cashier II, Cafeteria attendant, and small product assembler I. *Id.* at 54–55. The Vocational Expert also stated that all three suggested employment option involve frequent reaching. *Id.* at 55. The Vocational Expert explained that reaching was defined as, "extending hands or hand and arms in any direction." *Id.*

Mr. Kendall's attorney then proceeded to ask the Vocational Expert, "[i]f the hypothetical individual was limited to standing and walking not more than two hours in an eight-hour day and lifting no more than ten pounds, would such an individual be able to perform the jobs that you identified?" *Id.* To which the Vocation Expert explained that the hypothetical worker would not be able to perform such job because the level of exertion would be higher at light versus sedentary. *Id.* Mr. Kendall's attorney then asked, "[a]ssume the hypothetical individual would need to rest or recline at least an hour a day, would such an individual be able to perform the jobs you identified or any other jobs in the national economy?" *Id.* To which the Vocational Expert replied, "[n]o, they would not be able to." *Id.*

The ALJ erred in determining that the vocational expert's testimony was consistent with work that could be performed by Mr. Kendall within the residual functional capacity given by the consultative expert. Filing No. 13-2 at 20. Two different consultative experts

23

stated that Mr. Kendall could perform light work; could occasionally lift up to 20 pounds; frequently lift 10 pounds; push and pull without limitations; and could sit, stand, or walk for up to 6-hours in an 8-hour workday. Filing No. 13-3 at 64. Based on the consultative examiner's opinion, the Vocational Expert testified that Mr. Kendall could do the following light work: (1) cashier II; (2) cafeteria attendant; and (3) small product assembler I. Filing No. 13-2 at 18, 20.

The Court finds that these job suggestions are inadequate because they are based on the two consultative examiners' opinions, and not Dr. Wax's and/or Dr. Titus's opinions, which are a more accurate reflection of the record. The jobs stated above are for individuals who can stand and sit for long periods and lift up to 20 pounds, neither of which Mr. Kendall can do. Further, the vocational expert clearly determined that Mr. Kendall could not perform jobs in the economy if he was limited to standing and walking not more than two hours in the day nor lift more than 10 pounds. If Mr. Kendall had to rest or recline at least an hour a day, he would be unable to do any other jobs in the national economy according to the Vocational Expert.

**CONCLUSION**

The clear weight of the evidence points to a conclusion that Mr. Kendall has been disabled since November 17, 2017. "Where further hearings would merely delay a receipt of benefits, an order granting benefits is appropriate." *Hutsell v. Massanari*, 259 F.3d 707, 714 (8th Cir. 2001) (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984). Accordingly,

IT IS ORDERED:

1. Plaintiff's motion to reverse (Filing No. 15) is granted;

24

2.  Defendant's motion to affirm (Filing No. 17) is denied;

3.  The decision of the Commissioner is reversed;

4.  This action is remanded to the Social Security Administration for an award of

benefits; and

5.  A judgment will be entered in accordance with this memorandum and order.

Dated this 24th day of February, 2022.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge